# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Richard Passio, Jr., Appellant.

Appellate Case No. 2018-001488

———————————

Appeal From Jasper County
Carmen T. Mullen, Circuit Court Judge

———————————

Opinion No. 5841
Heard June 17, 2021 – Filed August 4, 2021

———————————

**AFFIRMED**

———————————

Elizabeth Anne Franklin-Best, of Elizabeth
Franklin-Best, P.C., of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Senior Deputy
Attorney General Donald J. Zelenka, Assistant Deputy
Attorney General Melody Jane Brown, and Assistant
Attorney General William Frederick Schumacher, IV, all
of Columbia, for Respondent.

———————————

**LOCKEMY, C.J.:** Richard Passio Jr. appeals his conviction for the murder of his
wife, Michelle Passio (Victim), and sentence of thirty years' imprisonment. On
appeal, Passio argues the trial court erred by denying his motion for a directed
verdict and by admitting a screenshot of his Facebook page. We affirm.

**FACTS/PROCEDURAL HISTORY**

Passio and his family owned and managed a restaurant in Ridgeland. Victim occasionally worked as a server when she was not taking care of their eight children. At 5:52 a.m. on June 3, 2019, Passio called 911 to report Victim had shot herself in their home.

Lieutenant Joey Ginn responded to Passio's home around 6:00 a.m. and met Passio on the porch. Passio had blood on his hands and dried blood on his clothing. Upon entering the home, Lieutenant Ginn found Victim deceased on the couch. He observed Victim had a gunshot wound under her chin and an exit wound at the top of her head. He saw a pool of blood on the floor and a child sleeping in a bassinet a few feet away. Law enforcement found a 9mm handgun, which had a spent shell casing in its chamber, on the floor next to Victim and an empty black case in the trunk of Passio's car.

Corporal Chris McIntosh testified he found three bullet strikes throughout the home: one in the ceiling of the room where he found Victim and two in an adjacent room. He stated Victim's body was cold to the touch, the room smelled of the early stages of decomposition, and the blood on the floor had coagulated. He testified Passio had a gash on his hand from the slide of the firearm.

Ryan Altman, a responding EMT, testified Victim's arm was cold to the touch and the blood on the floor had begun to coagulate. He testified the cut on Passio's hand was "crusty" and dry. Altman stated Victim had a workable cardiac rhythm but her injuries were inconsistent with life. Michael Singleton, the responding paramedic, testified Victim's skin was cyanotic and ashen,[1] and her blood had begun to coagulate. He explained Victim had no blood movement and no electrical activity.

Victim's hands tested positive for gunshot residue. The firearm's trigger had a mixture of Passio's and Victim's DNA on it. The firearm's slide and the gun case tested positive for Passio's DNA but not Victim's.

Ivey Bryan, a neighbor, testified that between 1:00 a.m. and 3:00 a.m., he heard arguing in Passio's home. He recalled that shortly after the argument, he heard four gunshots. Juanita Patrum, Victim's friend and neighbor, stated she was awake between 4:30 a.m. and 5:00 a.m. but did not hear any gunshots.

---

[1] Cyanotic and ashen skin is a bluish or purplish discoloration of the skin and mucous membranes caused by deficient oxygenation of the blood.

Jordan Moser testified she was bartending at Schooner's bar in Ridgeland the night Victim died. She explained Victim came to Schooner's that night, and appeared to be in good spirits. Sometime after midnight, Passio called the bar asking for Victim because he expected her to be home by midnight. Moser explained that a few minutes later Passio arrived and began arguing with Victim. She stated he was so angry he slapped a cigarette out of Victim's hand. Angel Rose, a friend of Victim who was in the bar that night, testified similarly to Moser.

Brandon Ashcraft, one of Passio's former employees, testified he had an affair with Victim. He explained Passio heard rumors of the affair and confronted him about them. Ashcraft stated he denied those rumors to Passio. Ashcraft stated Passio kept a firearm in a black case in the restaurant's office and that it was kept there because Passio was afraid Victim was suicidal. Ashcraft testified that on the night of the incident, he was in the bar with Victim, Moser, and Rose, when Passio came in and began to argue with Victim. He recalled Passio angrily slapped a cigarette out of Victim's hand, and Victim left the bar. Ashcraft testified Passio told him he was going to go back to his restaurant to grab alcohol. Ashcraft believed this was weird because there was no alcohol there after the restaurant lost its liquor license. Surveillance video showed Passio enter his restaurant and retrieve a black case at 1:55 a.m. Ashcraft explained that around 2:00 a.m., Passio came to Ashcraft's house to borrow a baby bottle. Ashcraft testified Passio told him about how bad Passio's and Victim's relationship was and stated, "I hope tonight's not the night," referring to Victim killing herself.

Lisa and Otto Helbig, former employees at the restaurant, also testified Passio kept a handgun in a black case in the restaurant's office. Carla Ashcraft, Victim's friend, testified she referred Victim to Catherine Badgett, a divorce attorney. Badgett stated she referred Victim to a domestic abuse shelter and to South Carolina Legal Services. The State rested, and Passio moved for a directed verdict arguing the State failed to present substantial circumstantial evidence of his guilt. The trial court denied Passio's motion.

Dr. Sarah Stuchell testified she was Victim's and Passio's psychologist and marital counselor. She stated Victim denied suicidal ideation, but explained she suffered from bipolar disorder and anxiety. She testified Passio suffered from anxiety, obsessive-compulsive disorder, and relationship distress.

Passio and Victim's eleven-year-old daughter (Daughter) testified on the night of the incident, she heard two loud bangs and then Victim angrily say, "Do you want

me to do it again?" Daughter stated she heard another shot followed by Passio crying. Daughter did not state what time she heard the shots.

Richard Passio Sr. (Father) testified that he knew Passio "as well as any father can know his son." During cross-examination, the State asked Father about parts of Passio's life that he did not know about, such as Passio's Craigslist ad looking for love and Passio lying about being a police officer. The State asked if Father was familiar with Passio's Facebook. The State showed him a screenshot of Passio's Facebook profile, and Father testified he recognized the photograph but not the caption. Passio objected based on relevance and lack of authentication. The trial court admitted the screenshot of Passio's Facebook into evidence. The caption read, "I know who I am. I'm a dude, playing a dude, disguised as another dude."[2] At the close of Passio's case-in-chief, he renewed his directed verdict motion, which the trial court denied.

During the State's closing argument, the State repeated Passio's Facebook caption and stated, "Well, he does know who he is, and he does know what he did. He knows the monster inside that he has tried to disguise. Don't be fooled by that disguise." The jury found Passio guilty of murder, and the trial court sentenced him to thirty years' imprisonment.

**ISSUES ON APPEAL**

1. Did the trial court err by denying Passio's motion for a directed verdict?

2. Did the trial court err by admitting a screenshot from Passio's Facebook profile because it was irrelevant and unduly prejudicial?

**STANDARD OF REVIEW**

"When ruling on a motion for a directed verdict, the trial court is concerned with the existence or nonexistence of evidence, not its weight." *State v. Hernandez*, 382 S.C. 620, 624, 677 S.E.2d 603, 605 (2009). "A defendant is entitled to a directed verdict when the state fails to produce evidence of the offense charged." *Id.* "If

---

[2] This was a quote from the 2008 comedy, *Tropic Thunder*. *See Tropic Thunder* (DreamWorks 2008). In the film, Robert Downey Jr. plays Kirk Lazarus, an Australian method actor playing an African-American sergeant during the Vietnam War. *Id.* In one scene, he is asked, "Who are you," to which Downey Jr. responds, "Me? I know who I am. I'm a dude, playing a dude, disguised as another dude."

there is any direct evidence or substantial circumstantial evidence reasonably tending to prove the guilt of the accused, the Court must find the case was properly submitted to the jury." *State v. Frazier*, 386 S.C. 526, 531, 689 S.E.2d 610, 613 (2010). "When reviewing a denial of a directed verdict, an appellate court views the evidence and all reasonable inferences in the light most favorable to the State." *Id*.

"The relevancy of evidence is an issue within the trial [court's] discretion." *State v. Gillian*, 373 S.C. 601, 612, 646 S.E.2d 872, 878 (2007). "The admission or exclusion of evidence is a matter addressed to the sound discretion of the trial court and its ruling will not be disturbed in the absence of a manifest abuse of discretion accompanied by probable prejudice." *State v. Collins*, 409 S.C. 524, 530, 763 S.E.2d 22, 25 (2014) (quoting *State v. Wise*, 359 S.C. 14, 21, 596 S.E.2d 475, 478 (2004)). "An abuse of discretion occurs when the conclusions of the trial court either lack evidentiary support or are controlled by an error of law." *Id.* (quoting *Wise*, 359 S.C. at 21, 596 S.E.2d at 478).

## LAW/ANALYSIS

## I.     DIRECTED VERDICT

Passio argues the trial court erred by denying his motion for a directed verdict because the State did not offer substantial circumstantial evidence of his guilt. Passio argues witnesses' testimony that Victim was cold to the touch, had coagulated blood, and had ashen skin was pseudo-scientific evidence that should have been discredited. Passio asserts no testimony proved the black case he retrieved from his restaurant contained the firearm used to kill Victim.

"A case should be submitted to the jury when the evidence is circumstantial 'if there is any substantial evidence which reasonably tends to prove the guilt of the accused or from which his guilt may be fairly and logically deduced.'" *State v. Bostick*, 392 S.C. 134, 139, 708 S.E.2d 774, 776 (2011) (quoting *State v. Mitchell*, 341 S.C. 406, 409, 535 S.E.2d 126, 127 (2000)). However, "[t]he trial [court] should grant a directed verdict when the evidence merely raises a suspicion that the accused is guilty." *Frazier*, 386 S.C. at 531, 689 S.E.2d at 613. "'Suspicion' implies a belief or opinion as to guilt based upon facts or circumstances which do not amount to proof." *State v. Pearson*, 415 S.C. 463, 469-70, 783 S.E.2d 802, 805 (2016) (quoting *State v. Cherry*, 361 S.C. 588, 594, 606 S.E.2d 475, 478 (2004)). "[A] trial [court] is not required to find that the evidence infers guilt to the exclusion of *any other reasonable hypothesis*." *Id.* at

470, 783 S.E.2d at 805 (2016) (quoting *State v. Ballenger*, 322 S.C. 196, 199, 470 S.E.2d 851, 853 (1996)).

> [A]lthough the *jury* must consider alternative hypotheses, the *court* must concern itself solely with the existence or non-existence of evidence from which a jury could reasonably infer guilt. This objective test is founded upon reasonableness. Accordingly, in ruling on a directed verdict motion where the State relies on circumstantial evidence, the court must determine whether the evidence presented is sufficient to allow a reasonable juror to find the defendant guilty beyond a reasonable doubt.

*State v. Bennett*, 415 S.C. 232, 237, 781 S.E.2d 352, 354 (2016).

An examination of the following directed verdict cases is illustrative. In *Bostick*, the victim was knocked out inside her home and the home was then set on fire. 392 S.C. at 136-37, 708 S.E.2d at 775. After interviewing appellant, investigators charged him with her murder. *Id.* at 137, 708 S.E.2d at 775. Investigators found blood on his jeans and gasoline on his shoes, and gasoline was the accelerant used to light the house on fire. *Id.* at 142, 708 S.E.2d at 778. The DNA test from the blood on his jeans was inconclusive but did not rule out the victim's DNA. *Id.* at 137, 708 S.E.2d at 775-76. Investigators also found some of the victim's personal items in a burn pile behind appellant's mother's home. *Id.* at 137, 708 S.E.2d at 775. On appeal, our supreme court reversed the trial court's denial of appellant's directed verdict motion. *Id.* at 141, 708 S.E.2d at 778. It held the evidence presented at trial merely raised a suspicion appellant committed the crime. *Id.* at 141-42, 708 S.E.2d at 778.

In *State v. Arnold*, the victim was shot and left off a dirt road in Colleton County. 361 S.C. 386, 388, 605 S.E.2d 529, 530 (2004). Victim drove a friend's car to go to a dentist's appointment on the last day he was seen alive. *Id.* Evidence showed he withdrew money from an ATM that day, but he was not seen again until his body was discovered. *Id.* The car was found in a parking lot in Johnson City, Tennessee, and one of the State's witnesses testified that appellant called him from a phone ten miles from where the car was found. *Id.* at 389, 605 S.E.2d at 530. In the center console of the car, investigators found a coffee cup lid containing appellant's fingerprint. *Id.* Our supreme court affirmed this court and held appellant's fingerprint on the lid only established he was in the borrowed car on the

last day the victim was seen alive, there was no evidence that appellant was at the scene of the crime, and while both appellant and the car were found in Tennessee, this only raised a suspicion of guilt and was not sufficient circumstantial evidence to show that appellant killed the victim. *Id.* at 390, 605 S.E.2d at 531.

In *Bennett*, a community center was burglarized. 415 S.C. at 234, 781 S.E.2d at 353. Evidence showed that a window had been shattered to facilitate entry; a television in the community room was tampered with, as if someone attempted to remove it; and a television and computer were stolen from the computer room. *Id.* Bennett was a frequent lawful visitor of the center, but testimony indicated he did not frequent the community room. *Id.* at 234-35, 781 S.E.2d at 353. Following the burglary, law enforcement lifted Bennett's fingerprint from the television in the community room. *Id.* at 234, 781 S.E.2d at 353. Additionally, law enforcement found two drops of blood matching Bennett's DNA where another television had been stolen. *Id.* The trial court denied Bennett's motion for a directed verdict, and the jury convicted him. *Id.* at 235, 781 S.E.2d at 353. Bennett appealed, and this court reversed his conviction, finding the evidence created only a suspicion of guilt. *Id.* Our supreme court reversed, holding this court had weighed the evidence and found a plausible alternate theory inconsistent with Bennett's guilt instead of determining whether any circumstantial evidence supported his guilt. *Id.* at 236-37, 781 S.E.2d at 354. It held forensic evidence placed Bennett inside of the community center, "and, more specifically, at the two places where the crimes had occurred," and that "[T]estimony suggested Bennett would have no reason to be in the community room." *Id.* at 237, 781 S.E.2d at 354.

Given these cases and the standard this court applies when reviewing a motion for a directed verdict, we find the trial court did not err in denying Passio's directed verdict motion. *See Frazier*, 386 S.C. at 531, 689 S.E.2d at 613 ("When reviewing a denial of a directed verdict, an appellate court views the evidence and all reasonable inferences in the light most favorable to the State.").

Viewing the evidence in the light most favorable to the State, evidence showed Victim was in good spirits and spending time with friends at a bar on the night of the incident. Later that evening, Passio went to the bar and fought with Victim and was angered enough to slap a cigarette out of Victim's hand. Passio left the bar and went to his restaurant, where he retrieved a black case, which was where he kept his handgun. Passio argues the State presented no evidence that the case from the surveillance video and his trunk held the gun used to kill Victim. However, witnesses testified Passio kept a firearm in the restaurant's office in a case similar to the one he carried out of the restaurant. In the light most favorable to the State,

the jury could use this evidence to find Passio carried his firearm out of his restaurant on the night Victim died. The jury could also infer this was strong evidence of Passio's guilt because the firearm was involved in Victim's death on the first night it came back to the house.

Moreover, the firearm had Passio's DNA on the trigger and slide and he admitted he was present when the fatal shot was fired. The jury could also reasonably infer Passio waited between two and four hours before calling 911 after Victim was shot. This timeline was evidenced by the dried blood on his pants, the blood coagulated on the floor, Bryan's testimony he heard four gunshots between the hours of 1:00 a.m. and 3:00 a.m., and Patrum's testimony she did not hear any gunshots between 4:30 a.m. and 5:00 a.m.[3] Furthermore, Dr. Stuchell testified Victim denied suicidal ideation. The foregoing represents evidence from which a reasonable juror could find Passio guilty beyond a reasonable doubt. *See State v. Bennett*, 415 S.C. 232, 237, 781 S.E.2d 352, 354 (2016) ("[T]he court must determine whether the evidence presented is sufficient to allow a reasonable juror to find the defendant guilty beyond a reasonable doubt.").

Finally, Passio asserts the State failed to supply evidence of motive because it failed to show that he knew Victim had an affair. However, evidence was presented that Passio knew of the rumors of the affair and found both Victim and Ashcraft at the same bar that night. Thus, the State presented evidence of motive regardless of whether he knew if those rumors were true. Moreover, motive is not an element of murder. *See State v. Smith*, 307 S.C. 376, 385, 415 S.E.2d 409, 414 (Ct. App. 1992) ("[I]t is well settled that motive is not an element of murder and, therefore, the State need not prove motive."). We find all of this evidence establishes substantial circumstantial evidence that supported the trial court's denial of Passio's directed verdict motion.

## II.    FACEBOOK SCREENSHOT

Passio argues the trial court erred by admitting a screenshot of his Facebook profile because it was irrelevant. He asserts the movie quote was used to raise suspicion that Passio was lying about murdering Victim. We disagree.

---

[3] Passio argues this court should discredit the blood evidence because it is pseudo-scientific testimony. However, the witnesses testified to the condition of Victim's blood and body as lay witnesses, not as expert witnesses. Moreover, the evidentiary value was cumulative to the direct testimony the State elicited from Bryan that he heard shots were fired between 1:00 a.m. and 3:00 a.m.

For evidence to be admissible, it must be relevant. Rule 402, SCRE. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, SCRE. "Evidence is relevant if it tends to establish or make more or less probable some matter in issue upon which it directly or indirectly bears, and it is not required that the inference sought should necessarily follow from the fact proved." *State v. Sweat*, 362 S.C. 117, 126-27, 606 S.E.2d 508, 513 (Ct. App. 2004). Evidence showing a witness's bias is relevant impeachment evidence. *See* Rule 608(c), SCRE ("Bias, prejudice or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by evidence otherwise adduced.").

"I know who I am. I'm a dude, playing a dude, disguised as another dude." In its closing, the State used this quote to paint Passio as a man disguising the truth. In our view, the State is donning the disguise. The State argues its purpose for admitting this quote was to impeach Father's testimony and show bias; specifically, that he did not know Passio as well as he testified. Although the State used the vehicle of impeachment to admit this evidence, it seems its true guise was to show Passio was "disguised as another dude." Regardless, we affirm the trial court's ruling because this evidence was relevant to the State's asserted purpose.

We find the trial court did not abuse its discretion because this evidence could be used to impeach Father's testimony and show his bias. When the State cross-examined Father, it asked questions that sought to elicit evidence Father was not as well acquainted with Passio's life as he testified he was. The State asked Father if he knew about Passio's Craigslist ad looking for love and if Father knew Passio had lied about being a police officer. Following those questions, the State asked Father if he was familiar with Passio's Facebook page. Father said he was familiar with it, and the trial court admitted the screenshot over Passio's objection. This screenshot was relevant to show Father did not know Passio as well as he testified. This evidence impeached Father's testimony by showing Father's potential bias and motive to misrepresent. Thus, we find the trial court did not abuse its discretion in admitting the screenshot because it had some probative value as to Father's bias.

**CONCLUSION**

Based on the foregoing, we find the trial court did not err in denying Passio's motion for a directed verdict and by admitting a screenshot of Passio's Facebook profile. According, Passio's conviction is

**AFFIRMED.**

**HUFF and HEWITT, JJ., concur.**